UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PRIDE PACKING CO., a Washington corporation,,**<br><br>Plaintiff,<br><br>v.<br><br>**MAF INDUSTRIES, INC.; and DOES 1-10, inclusive,**<br><br>Defendants. | CASE NO. 1:13-cv-00573-AWI-GSA<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>Doc. # 71 |

This is an action in diversity by plaintiff Pride Packaging Corporation ("Plaintiff") for breach of contractual and quasi-contractual warrantees against defendant MAF Industries, Inc. ("Defendant"). Currently before the court is the Defendants motion for summary judgment or summary adjudication as to all claims alleged in Plaintiff's complaint. The parties do not dispute that the court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper in this court.

**PROCEDURAL HISTORY**

The complaint in this action was filed on April 18, 2013. Defendant filed an answer on June 5, 2013. The trial date, which was originally set for February 27, 2014, was continued by successive stipulations to April 26, 2016. The parties filed a joint pretrial statement on January 21, 2016, and the court issued a pretrial order on February 1, 2016, and motions in limine were filed by both parties on February 29, 2016. After review of the joint pretrial statement and the motions in limine, the court observed that a number of purely legal issues had been raised in

motions in limine that could be more productively raised in a motion for summary judgment. This observation was communicated to the parties by the court's order of March 25, 2016, setting a telephonic conference for March 31, 2016, to explore the possibility of scheduling briefing for dispositive motions. At the telephonic conference the court vacated the trial date and all trial-associated dates and set a briefing schedule for further dispositive motions. Pursuant to that order, Defendant filed its motion for summary judgment on May 16, 2016. Plaintiff's opposition was filed on June 6, 2016, and Defendant's reply was filed on June 20, 2016. The matter was taken under submission as of July 5, 2016.

## MATERIAL FACTS

This action arises out of Plaintiff's efforts to enforce the terms of what both parties understand is a written contract for the sale and installation of a cherry packing line manufactured by Defendant to and for use by Plaintiff (hereinafter, the "Contract"). There is no dispute as to what is written in the Contract; only dispute as to its legal significance. The parties do not materially dispute that "[t]he purchase agreement for the cherry line between Defendant and Plaintiff consists of a six-page parts list and a double-sided, one page document that lists the price and representations on one side and the 'Terms and Conditions' on the other." Doc. # 73 at ¶ 2. Plaintiff's opposition quotes extensively and accurately from the portion of the Contract that is referred to as "Terms and Conditions." While Plaintiff acknowledges that the provisions in the Terms and Conditions contain an integration clause, disclaim any warranty other than what is expressly stated and deny liability for special, incidental or consequential damages; Plaintiff contends these provisions are unenforceable because: (1) the Contract is not fully integrated, (2) the Terms and Conditions portion of the Contract constitutes a contract of adhesion, and (3) the Terms and Conditions are unconscionable.

This action arises out of the failure of the cherry packing line to process cherries at a rate Plaintiff alleges was agreed upon and represented as achievable by Defendant. Specifically, Plaintiff alleges it was promised that the processing line would process cherries at a rate of six tons per hour. Plaintiff alleges that a six-ton-per-hour processing rate is achievable only for

batches containing the largest cherries and that rates closer to one to two tons per hour are achieved for more a more normal distribution of cherry sizes.  Based on its contentions that the provisions of the Terms and Conditions Defendants might rely upon to deny or limit liability due to failure of the cherry line to perform as promised are unenforceable, Plaintiff alleges a total of five claims for relief.  There are, in order, breach of express warranty, breach of implied warranty, and a single claim for relief alleging negligence, fraud and misrepresentation.

## LEGAL STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Although the party moving for summary judgment always has the initial responsibility of informing the court of the basis for its motion, the nature of the responsibility varies "depending on whether the legal issues are ones on which the movant or the non-movant would bear the burden of proof at trial." Cecala v. Newman, 532 F.Supp.2d 1118, 1132-1133 (D. Ariz. 2007).  A party that does not have the ultimate burden of persuasion at trial – usually but not always the defendant – "has both the initial burden of production and the ultimate burden of persuasion on the motion for summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the

4

opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

**DISCUSSION**

**I. Enforceability of Contract Terms**

At its core, this action is predicated on the extent to which the Contract, and specifically the Terms and Conditions portion of the Contract is enforceable. The court will consider each of Plaintiff's three arguments for unenforceability of the Contract listed above in order.

*A. Integration of Contractual Terms*

Plaintiff's opposition quotes the integration clause from the Contract as follows:

> This order constitutes the entire agreement between the parties, representations, commitments or statements made by Seller or any of its agents, servants of employees except as provided herein. No terms or conditions other than those contained herein, whether contained in Purchaser's purchase order, acknowledgement or elsewhere can vary or add to these terms and conditions, and no written or oral agreement which purports to alter these Terms and Conditions shall be binding upon Seller unless set forth in writing and signed by an authorized representative of Seller.

Doc. # 76 at 4:20-26.

The parties dispute to some extent the standard by which courts are to determine whether a written agreement is integrated, partially integrated or not integrated. Plaintiff contends that a court's determination of whether a contract is integrated is based on the consideration of five factors, in support of which Plaintiff cites Stevenson v. Oceanic Bank, 223 Cal.App.3d 306, 316 (1990). See Doc. # 76 at 7:3-9 (listing five factors). Defendant contends that Plaintiff has misstated the holding in Stevenson and that the integration of a contract is to be determined by its own terms and nothing else. See Doc. # 80 at 2:19-25 (citing Masterson v. Sine, 68 Cal.2d 222, 226 (1968) and earlier California Supreme Court cases for the proposition that "integration in a contract is to be determined solely from the face of the instrument.")

This court's understanding of California's standard for the determination of contract integration is somewhere in between. As explained in Stevenson:

> "It has been hornbook law since Masterson v. Sine (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], that whether or not a written agreement is 'integrated,' i.e., expresses the entire agreement of the parties, depends on the parties' intent, which must be resolved by consideration of relevant extrinsic evidence that explains but does not flatly contradict the writing. [Citation.] The question of integration must be resolved preliminarily by the court, not a jury, and only after the court finds the agreement not integrated may parol evidence be admitted to amplify its terms. [Citation.] ... An important consideration on the issue of integration is whether a claimed collateral agreement involves terms that would 'naturally' have been included in the writing. [Citations.]" (Mobil Oil Corp. v. Handley (1978) 76 Cal.App.3d 956, 961 [143 Cal.Rptr. 321], italics added.)

Stevenson v. Oceanic Bank, 223 Cal. App. 3d 306, 316-17, 272 Cal. Rptr. 757 (1990).

The analytical starting point is provisions in the Contract that address issues of performance. Basically, the Contract deals with the sale of a "cherry packing line" which is comprised of a set of discrete functional components that are listed on pages 2 through 4 of the Contract. For example, the component list describes several conveyor belts, a "water stem separator," an "eliminator sizer," and a "clamshell single head with weigher. See Doc # 46 at 40-43. It may be inferred, therefore, that the cherry packing line, taken as a whole, has performance characteristics that are a function of both the performance characteristics of the individual components and of the integration of the individual components to each other.

Aside from the "Terms and Conditions" portion of the Contract the only warranty provisions provide that the component parts of are warranted "for a period of 2 years after startup." The same section also provides that "[d]uring this Warranty period, Mechanical Technicians and Electronic Technicians are on-call for trouble shooting, corrections, training and operational assistance." Doc. # 46 at 44. The major portion of the warranty provisions or disclaimers are provided by Paragraph 2 of the Terms and Conditions which states:

> Seller warrants new equipment of its own manufacture against defective workmanship and materials for a period of 90 days from the date of startup by the original retail purchaser under normal use and service, but not against damage of any kind resulting from improper installation maintenance [sic]. Seller's obligations under this warranty are limited to repair or replacement, at Seller's election, of defective parts F.O.B. the factory where originally manufactured. Used equipment is sold AS IS. THERE ARE NO UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS,

> IMPLIED, STATUTORY OR OTHERWISE (INCLUDING BUT WITHOUT LIMITATION, THE IMPLIED WARRANTEES FOR MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE), OTHER THAN THOSE EXPRESSLY SET FORTH HEREIN.  Except as expressly provided herein, Seller shall not be liable to Purchaser for damages of any kind or nature occasioned by or arising out of the installation, operation, use, misuse, nonuse, repair or replacement of said equipment, or out of the use or any method or process from which the same may be employed.  In the event, notwithstanding the terms of this agreement, it is determined by a court of competent jurisdiction that an express warranty has been given by Seller to purchaser with respect to the Speed, Capacity or other like performance characteristics of said equipment, Seller's liability for breach of the same shall be limited to accepting return of such equipment F.O.B. plant of manufacture, refunding any amounts paid thereon by Purchaser (less depreciation at the rate of 15% per year if Purchaser has use such equipment more than 30 days) and canceling any balance still owing on the equipment.

Doc. # 33-1 at 2. At paragraph 5 of the Terms and Conditions, the scope and amount of damages arising from any suit are limited as follows:

> (a)  Except as provided in the paragraph herein entitled "Patents", Seller's liability on any claim of any kind, including negligence of any party including Seller, Warranty, contract, tort or strict liability, for any loss or damage resulting from, arising out of, or connected with this contract or from the performance or breach thereof, or from manufacture, sale, delivery, resale repair or use of any product covered by or furnished under this contract shall in no case exceed the price allocatable to the product or services which gives rise to the claim.
>
> (b)  In no event shall Seller be liable for special, incidental, incidental or consequential damages, including, but not limited to loss of profits or capital, downtime costs, attorney's fees and expenses or claims of customers, suppliers or contractors of Purchaser.

Id.

Plaintiff contends the Contract is not integrated so that parol evidence may be considered reflecting the intent of the parties to warrant the performance characteristics of the cherry packing line. Consistent with the holding in Stevenson, the court considers the terms contained within the Contract and considers whether a claimed collateral agreement involves terms that would 'naturally' have been included in the writing.  A review of all of the terms of the Contract that may be understood as terms of warranty express the clear intention of the parties to warrant the component parts of the processing line for a period of two years but not to warrant the performance characteristics of the processing line as a whole.  Plaintiff contends that the Contract is not integrated because it lacks any warranty of performance; a term that would "naturally" have been incorporated into the Contract given Defendant's representation that the line was capable of processing six tons of cherries per hour.  The court disagrees that such a provision would naturally

7

1  be incorporated in to the Contract, given the careful and extensive limitations of liability expressed
2  in the Terms and Conditions.

3      Defendant's refusal to warranty a specific level of processing capacity is logical given the nature of the cherry packing line as a whole.  It is obvious from the parties' descriptions of the line that throughput characteristics of the line are dependent not only on functioning of individual component modules but also on the integration of the component modules and the characteristics of the inputs.  It cannot be held that a rational manufacturer would warranty performance characteristics when the performance characteristics of a complex piece of machinery are determined to a substantial extent by factors outside of the manufacturer's control, such as the quality and characteristics of the inputs, staff training and line management.  Indeed, a manufacturer's decision to limit its warranty liability to the *functioning* of a product and to exclude warranty of its performance would be expected to be the rule, not the exception.

      The court therefore finds that the Contact is fully integrated according to the provisions set forth within it and that expansion of the terms of the warranty to permit damages for the failure to process cherries at a particular rate would not naturally have been included in such warrantee.

### B. Contract is not "Adhesive"

      Plaintiff next contends that the Contract for the sale of the cherry packing line is unenforceable because it is a contract of adhesion.  "'The term 'contract of adhesion' signifies a standardized contract which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. [Citation.] A contract of adhesion is unenforceable [when] it defeats the reasonable expectation of the adhering party.'  [Citation.[" Stevenson, 223 Cal. App. 3d at 318.  While the provision of a guarantee by an agreement does not constitute a contract of adhesion because it creates liability, the *disclaimer* of warranty or limitation of liability *may* constitute a contract of adhesion.  In cases where an agreement disclaims or limits liability "such exclusion or limitation must be expressed in such conspicuous form as to draw attention of the ordinary person entering the contract," Security Pacific Nat'l Bank v. Adamo, 142 Cal.App.3d 492, 497-498 (1983).

      The undisputed facts support the conclusion that the Contract was not a contract of

adhesion. First, there is no indication that Plaintiff occupied an inferior or weak position in the negotiation of the Contract. Plaintiff acknowledges that the final Contract was the product of three-and-a-half months of negotiation and that there were successive iterations of proposed Contracts prior to the adoption of the final agreement. Two proposed contracts drafted prior to the final Contract are attached to Plaintiff's complaint. Thus, there is ample evidence of a negotiations process and of ample time in which the individual or individuals negotiating on behalf of Plaintiff could have raised the issue of guarantee of performance characteristics. Plaintiff presents no evidence that the Contract was presented to them on a take-it-or-leave-it basis nor is there any allegation that Defendants did or would have refused to negotiate alternative warranty provisions if asked by Plaintiff to do so.

Second, although the Terms and Conditions are printed in smaller type and set forth on the back of another page, the major terms of warranty disclaimer are legible and set forth in all-capital letters as quoted above and are quite noticeable to the reader. Plaintiff admits that it had previously done business with Defendant and had been in the fruit packing business for a considerable length of time. Plaintiff cannot therefore contend that it was taken advantage of because of its inexperience. While Teresa Spada may claim to have not read or not remembered the Terms and Conditions provisions, she did sign the acceptance of the Terms and Conditions at the bottom of the page on which they were printed. Doc. # 33-1 at 2. The court can find no facts to indicate that Plaintiff was inexperienced or that Defendant misled or took advantage of Plaintiff.

The court concludes the Contract was not a contract of adhesion.


### C. *Unconscionability*

Plaintiff, in its opposition relies heavily on A&M Produce Co. v. FMC Corp., 135 Cal.App.3rd 473 (1982), both for its analytical approach and its outcome. As pointed out in California Grocers Assn. v. Bank of America, 22 Cal.App.4th 205 (1994), there has been some inconsistency in the analytical approach of California courts as exemplified on one hand by A&M Produce, which divided the issue of unconscionability into procedural and substantive components and Graham v. Scissor-Tail, Inc., 28 Cal.3d 807 (1981) ("Scissor-Tail") , which observed that the

9

"notion of 'procedural' unconscionability merely addresses the question of whether a contract is adhesive." California Grocers, 22 Cal.App.4th at 214. The approach adopted in Scissor-Tail has been summarized as follows:

> Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him. The second – a principle of equity applicable to all contracts generally – is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or "unconscionable."

Perdue v. Crocker Nat'l Bank, 28 Cal.3d 913, 925 (1985). As the Perdue Court observed, Graham v. Scissor-Tail comports somewhat more closely to the California precedent while A&M Produce conforms more closely to the Uniform Commercial Code and the cases decided under that code. "Both pathways should lead to the same result." Perdue, 38 Cal.3d at 925 fn.9.

Plaintiff places considerable emphasis on the decision in A&M Produce because of the factual similarities between that case and this and because the appellate court in A&M Produce upheld the trial court's determination that a contract for the sale of a tomato sizing machine was a contract of adhesion and contained unconscionable terms. See A&M Produce, 135 Cal.App.3d at 490-491 (explaining finding of both procedural and substantive unconscionability in the contract). The court will follow the California appellate court in A&M Produce not because the court feels that it is more authoritative but because the factual dissimilarities between that case and this are important to this court's conclusion regarding unconscionability.

The holding in A&M Produce rests on a number of findings that are not apparent in the case at bar. First, while the plaintiff in A&M Produce was a tomato grower with considerable business experience, that business had no prior experience with mechanized processing and was contracting with FMC, "an enormous diversified corporation." The court held the difference in size and experience in automation made for a significant imbalance between the contracting parties. 135 Cal.App.3d at 489. As this court discussed previously, the facts of the instant case do not support a finding of any significant differential between Plaintiff and Defendant. Both are sizable companies but neither is "enormous" or "diversified" or demonstrably "stronger" than the

other.

Second, the court in A&M Produce noted that the contract in that case had many of the identifying characteristics of an adhesion contract that this court has found not to be present. The A&M Produce court the provisions for both disclaimer of warranty and limitations of damages were printed "in the middle of the back page of a long preprinted form contract which was only casually shown to [the plaintiff's representative.] It was never suggested to him, either verbally or in writing, that he read the back of the form." Id. at 490. The A&M Produce court went on to observe "one suspects that the length, complexity and obtuseness of most form contracts may be due at least in part to the seller's preference that the buyer will be dissuaded from reading that to which he is supposedly agreeing." Id. In the case at bar, the court has noted that the Contract, although multi-paged, is not preprinted except for the Terms and Conditions portion, which appears preprinted but is not very lengthy and is fairly easy to read.[1] Further, there is no allegation in this case that Ms. Spada was in any way dissuaded from reading the Terms and Conditions and her full signature at the bottom of that page can only be interpreted as indicating she had a full opportunity to read and evaluate the terms of that section.

The A&M Produce Court, after concluding that what it termed procedural unconscionability was present in the formation of the contract between the produce company and FMC. Based partially on that finding the appellate court upheld the trial court's determination that substantive unconscionability was also present because the terms of the contract failed to guarantee the performance characteristics of the sorting machine and, further, it disclaimed special and/or consequential damages See id. at 491. The court reasoned, "[s]ince a product's performance forms the fundamental basis for a sales contract, it is patently unreasonable to assume that a buyer would purchase a *standardized mass-produced product* from an industry seller

---

[1] It is difficult to tell if the court in A&M Produce was influenced to some extent by the font size on the contract at issue in that case. A photocopy of the front and back of what appears to be the contract in that case is reproduced at the end of the Westlaw version of the appellate court's opinion. The "Terms and Conditions" portion of that contract appear to be more lengthy than is the case with the Contract in this case; and those Terms and Conditions are printed on approximately one-quarter of one page. The print is unreadable except for the section disavowing express or implied warranties, which is printed in all capitals and is therefore readable with some difficulty. While this court required the submission of a more readable photocopy of the "Terms and Conditions" portion of the Contract, there has been no allegation that the Terms and Conditions on the Contract that was executed were unreadable or difficult to read.

without any enforceable performance standards." <u>Id.</u> (italics added). This is the position Plaintiff urges on this court.

Notwithstanding any qualms the court may have concerning the general applicability of the <u>A&M Products</u> court's finding of unconscionability in a disclaimer of performance warranty, the court notes that the cherry packing line manufactured by Defendant was definitely not a standardized mass-produced product. The court finds that this factual distinction is sufficient to support a different outcome in the case now before the court. As discussed above, the court finds that the warrantee provisions of the Contract and its disclaimer of warranty provisions are neither one-sided or without justification. This finding, together with the finding that there is no evidence of procedural unconscionability leads the court to conclude that the disclaimer of warranty and limitations of damages provisions of the Contract were not unconscionable.

The court concludes that the terms of the Contract; including terms limiting the scope of express warranty, disclaiming all implied warranties (including warranty of product performance), and disclaiming consequential or special damages, are not unenforceable by reason of incomplete integration, adhesive nature of the Contract or unconscionability.

## II. Plaintiff's Contract Claims

Plaintiff's first four claims for relief are based on Defendant's alleged breach of the Contract. In order, Plaintiff's first three claims for relief allege claims for breach of contract pursuant to California Civil Code section 1549, breach of express warranty pursuant to California Uniform Commercial Code section 2313, breach of implied warranty of merchantability pursuant to California Uniform Commercial Code section 2314(2), and breach of implied warranty of fitness for a particular purpose pursuant to California Uniform Commercial Code section 2315. Plaintiff's claims for breach are based on the undisputed fact that Plaintiff made it clear to Defendant that they wanted a cherry packing line that would process six tons of cherries per hour, Defendant represented that it could build a line that met Plaintiff's needs,[2] and the line that was

---

[2] There is some dispute as to the actual representations made. Plaintiff states it "made it clear from the outset" it wanted a line that would process six tons per hour. Defendant alleges it responded by representing that it could manufacture a line that would achieve a six-ton-per-hour rate only if "ideal conditions, including the size of the cherries" were present. Doc. # 80-1 at 6, ¶5.

built and installed by Defendant did not process six tons of cherries per hour.[3] Significantly, Plaintiff does not allege that the performance issues with the processing line arise out of any defective or broken part. Because the Contract limits Defendant's obligation to the repair and replacement of component parts that are broken or defective and excludes all other remedies and because the court has held these terms of the Contract enforceable, Plaintiff's contract-based claims for relief fail. Defendant is therefore entitled to summary judgment as to Plaintiff's contract claims.

### III. Plaintiff's Tort Claims

Plaintiff's fifth, sixth and seventh claims for relief allege tort claims for, in order, negligence pursuant to Cal. Civ. Code § 1714, intentional misrepresentation pursuant to Cal. Civ. Code § 1710, and fraudulent inducement pursuant to Cal. Civ. Code § 1709. The court notes at the outset that there is a difference between the facts as alleged in Plaintiff's complaint and the material facts alleged by the parties in connection with the motion for summary judgment, and that difference is of significance to Plaintiff's tort claims. At paragraph 20 of the complaint, Plaintiff alleges: "The Local Sales Agents assured Plaintiff that Defendant's Cherry Line would meet or exceed Plaintiff's expectations and production demands. The Local Sales Agents specifically promised that the Cherry Line would run at least six (6) tons of cherries per hour." In their Statement of Additional Material Facts, Plaintiffs make two allegations. First, they allege that "[Plaintiff's] representatives made it clear from the outset of discussions and/or negotiations that *it wanted* a cherry line that would function at a rate of 6 tons per hour." Doc. # 80-1 at 6, ¶5 (italics added). At paragraph 12 of their Additional Material Facts, Plaintiff states "MAF Personnel involved in the sale to [Plaintiff] overstated the production capacity and sizing quality of the cherry line misleading [Plaintiff]." Doc. # 80-1 at 8, ¶ 12. Thus, it appears that Plaintiff has withdrawn from its original allegation that Defendant's representatives promised any specific performance characteristics. Also, Plaintiff's proffer of the fact that MAF personnel "overstated

---

[3] There is also some dispute as to the extent to which the processing line falls short of Plaintiff's performance expectations. Plaintiff alleges a 1-2 ton per hour rate and Defendant alleges that over time the processing capacity would be expected to rise and that the rate has risen over time and over a normal range of cherry sizes up to 5 tons per hour. See Doc. # 80-1 at 8, ¶11.

1  the production capacity and sizing quality of the cherry line" is not a fact, it is a conclusion.  It is
2  significant that Plaintiffs do not allege that Defendant ever made the statement that the cherry line,
3  in the configuration actually purchased by Plaintiffs, could process six tons of cherries per hour
4  across a wide range of cherry sizes and qualities.  Plaintiff has not alleged any facts that would
5  directly counter Defendant's allegation that Defendant had specifically represented to Plaintiff that
6  "ideal conditions, including the size of the cherries, would be needed" to achieve the target rate of
7  6 tons per hour.  See Doc. 80-1 at 6, ¶5 (Defendant's Response).

### A. Negligence

Plaintiff's claim for negligence, as the court understands it, alleges that Defendant "was negligent and failed to exercise reasonable care in designing, supplying and installing the Cherry Line; and failed to adequately warn Plaintiff of the limited performance of the Cherry Line when handling smaller size cherries."  Defendant's duty as far as the manufacture, supplying and installation of the line goes, is limited by the terms of the Contract to supplying component parts that are without defect and are not broken and are installed in working order.  As previously discussed, Plaintiff has not alleged that Defendant installed any broken or non-functional component parts or that Defendant failed to undertake replacement or repair of component parts that were broken or non-functional.  Therefore, Plaintiff has failed to allege any issue of material fact as to whether Defendant breached any duty with respect to the equipment itself.

"Under California law, the elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate [or legal] cause between the breach and (4) the plaintiff's injury."  Davis v. Amtrak, 2013 WL 3187385 (N.D. Cal. 2013) at *2. With regard to failing to inform Plaintiff of the performance capabilities of the line, Defendant's duty is simply to exercise reasonable care in representing the capabilities of the processing line. To show the existence of any issue of material fact regarding Defendant's representations of its product, Plaintiff is required to produce evidence showing that Defendant was unreasonable in representing the packing line's performance characteristics.

In Document # 79-1, Defendant provides excerpts of deposition transcripts of Deanna Adams, Robert Schmitt and Ernie Spada, who represented Plaintiff during negotiations and were

1   on the receiving end of representations made by Defendant concerning product performance.  The
2   excerpts of the Adams Declaration support the allegation that Defendant did make representations
3   regarding the ability of the proposed cherry packing line to process six tons per hour.  However,
4   the Adams Declaration observes that the representations made by Defendants were not
5   deliberately misleading, but were based on a misunderstanding (or failure of Defendant to
6   understand) the nature of Plaintiff's business.  In particular, the Adams Declaration notes that
7   Defendant was not aware that Plaintiff intended to process cherries other than the ones grown by
8   them and which were smaller in average size of the cherries to be process.  See Doc. # 79-1 at 29.

9        Similarly, the deposition of Robert Schmitt lends support to Plaintiff's contention that they
10  were "misled" as to both the processing rate and sizing accuracy achievable by the cherry packing
11  line, however Schmitt's testimony is explicit in observing that Defendant did not "lie" in its
12  representations.  See Doc. # 79-1 at 44.  Perhaps the most telling portion of Schmitt's testimony
13  was his recognition that he could not draw a firm conclusion regarding the intent of Defendant to
14  mislead because, as he observed, "I don't know [if Plaintiff was being intentionally misleading], it
15  was their first line as well."  Id.  The deposition of Ernie Spada adds little additional information
16  except that in his Deposition Spada acknowledges the express terms of the Contract and states he
17  did not see fit to contest them or seek to alter them.  See Doc. at 4-5.

18       In support of its motion for summary judgment, Defendant also includes a copy of excerpts
19  from the deposition of Bryan Brown, one of Defendant's employees who represented Defendant
20  during the negotiating process.  Basically, Brown's deposition supports Plaintiff's allegation that
21  Plaintiff had communicated clearly their requirement (or desire) for a line that could process six
22  tons of cherries per hour.  Although Brown's deposition testimony uses more technical terms, it
23  conveys several significant points.  First, Brown's deposition suggests, but does not explicitly
24  state, that the through-put of cherries in tons per hour is a function of the size of the cherries not
25  necessarily because of technical issues with the processing line but simply because the rate of
26  processing is more or less constant with regard to the number of cherries sorted per unit of time
27  and it takes more cherries of a smaller size to constitute a ton of cherries than would be the case if
28  all the cherries were large (size 8) cherries.  See Doc. 80-2 at 10 (Deponent states that Ernie Spada

15

knows, based on his experience with an apple packing line, that processing a given weight of apples takes less time if the apples are larger).  Brown testified that the production number he quoted was based on Plaintiff's representation that they would be processing predominantly large (size 8) cherries from Plaintiff's orchards.  Lastly, the Brown Declaration indicates that at least some portion of the performance problems with the cherry packing line were the result of Plaintiff's failure to properly staff and manage the processing line.  Specifically, Brown testified that Plaintiff failed to adequately staff the sorting table, id. at 12, and that Plaintiff had been informed that a small fruit eliminator had been suggested as necessary to achieving optimal performance, but had not been purchased by Plaintiff.

The facts of this case do not suggest the breach of a duty of care so much as missed opportunities for both parties to have been more explicit with regard to expected conditions and expected results.  The court finds that Defendant suggested that Plaintiff purchase components (such as a small fruit eliminator) and that they take management steps (such as using an adequate number of sorters) that they felt would help achieve maximum performance but that Plaintiff declined to purchase or supply.  Given a reasonable expectation that size and quality of the fruit might have some bearing on production capacity in terms of weight per hour based on experience with other processing lines, it is not unreasonable to hold that it was Plaintiff's responsibility to ask specifically about the performance capacity of the processing line across the range of cherry sizes and quality that it anticipated processing.  There is no indication Plaintiff asked these important questions.  It also appears that Defendant could possibly have been more explicit in presenting the performance characteristics of the cherry line.

The court finds, however, that the fact that Defendant could have done better does not, in this case, amount to an unreasonable failure to discharge the duty to accurately represent the characteristics of the cherry packing line.  Defendant was not erroneous in representing that the line could process six tons of cherries per hour under optimal conditions.  Plaintiff's also knew or should have known that this cherry line was the first produced by Defendant and that Defendant therefore had no basis for making representations of system performance across a broad range of conditions; especially conditions encountered in the processing of small, low quality fruit

produced by other growers.

Although the issue is somewhat close, the court finds that Defendants have carried their burden to show there remains no issue of material fact as to whether they failed to use reasonable care in the representation of the performance characteristics of the cherry packing line.

### B. Intentional Misrepresentation and Fraudulent Inducement

Plaintiff's claims for intentional misrepresentation and fraudulent inducement require little discussion. In their opposition to Defendant's motion for summary judgment, Plaintiffs set forth the elements of fraud and intentional misrepresentation as provided by the relevant statutes. Assuming these elements to be legally correct, the court finds that Plaintiff has failed to demonstrate that there remains a material issue of fact as to whether Defendant ever made an affirmative statement that was known or that should have been known by Defendant to be untrue or that was without grounds for believing to be true. With regard to misrepresentation, the court also finds Plaintiff has produced no evidence to show that any fact was suppressed regarding the processing line's performance.

The court therefore concludes that Plaintiff has failed to show that there remains an issue of material fact as to the claims for intentional misrepresentation or fraudulent inducement.

THEREFORE, for the reasons discussed above, it is hereby ORDERED that Defendant's motion for summary judgment is hereby GRANTED as to all claims asserted by Plaintiff's complaint. The Clerk of the Court shall ENTER JUDGMENT for Defendant and shall CLOSE the CASE.

IT IS SO ORDERED.

Dated:   July 7, 2016                           _____
                                                SENIOR DISTRICT JUDGE